

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA, )
)
    v. )      Criminal No. 01-10198-NG
)
ERICA CHASE, and )
LEO V. FELTON, )
    Defendants. )

GERTNER, D.J.:

## MEMORANDUM AND ORDER RE: MOTIONS OF DEFENDANTS FELTON AND CHASE FOR JUDGMENT OF ACQUITTAL ON COUNT THREE OF THE INDICTMENT
September 13, 2002

Count Three of the Second Superceding Indictment

("Indictment") charges both defendants Leo V. Felton ("Felton")

and Erica Chase ("Chase") with knowing possession of a firearm in

furtherance of a crime of violence in violation of 18 U.S.C. §

924(c) ("§ 924(c)" or "Section 924(c)").[1]  The crime of violence

implicated here is conspiracy to make and possess a destructive

device in violation of 18 U.S.C. § 371 and 26 U.S.C. §§ 5822,

5841, and 5861(d) and (f).[2]  The jury found both defendants

---

[1] The defendants were charged with conspiracy to make and possess an unregistered destructive device (Count One); receipt of explosives with intent to kill or injure persons or damage property (Count Two - Felton only); possession of a firearm in furtherance of a crime of violence (Count Three); possession of a firearm (Counts Four and Five - Felton only); conspiracy to make and pass counterfeit notes (Count Six); making counterfeit notes (Count Seven); conspiracy to obstruct justice (Count Eight); obstruction of justice (Counts Nine and Ten); conspiracy to commit bank robbery and/or to interfere with commerce by robbery (Count Eleven - Felton only); bank robbery (Count Twelve - Felton only).  The jury found Chase not guilty of Count Seven, making counterfeit notes.  They found the defendants guilty on all remaining counts.

[2] I found that this crime was a "crime of violence" as defined by 18 U.S.C. § 924(c)(3) in an earlier order dated July 8, 2002.

206

guilty of this offense, based in part on the fact that a firearm was found in the apartment shared by Chase and Felton at 59 Salem Street, in the North End of Boston.  Neither defendant was carrying the firearm at the time of his or her arrest.

Both defendants moved for acquittal at the close of the government's case and at the close of the evidence.[3]  See Fed. R. Crim. P. 29(a).  They promptly renewed their motions after the jury returned its verdict.[4]  See Fed. R. Crim. P. 29(c) (allowing defendant to make or renew motion for judgment of acquittal within seven days after jury reaches a guilty verdict).

The crimes of which the defendants have been convicted are serious ones, and deeply, deeply, troubling.  But my charge is to look, with a neutral eye, at the law -- whether it has been appropriately applied here; what precedent it sets for other cases.

On the other hand, the standard on a motion for acquittal is a strict one:  "[i]f the evidence presented, taken in the light most flattering to the prosecution, together with all reasonable inferences favorable to it, permits a rational jury to find each essential element of the crime charged beyond a reasonable doubt,

---

[3] Felton moved for a judgment of acquittal on all counts at the end of the government's evidence while Chase moved for a judgment of acquittal only as to Count Three.

[4] After the jury reached its verdict, Felton renewed his motion for a judgment of acquittal only as to Counts Three and Eleven.

then the evidence is legally sufficient." <u>United States v.</u>
<u>Olbres</u>, 61 F. 3d 967, 970 (1st Cir. 1995).

At the same time, the critical issue here is a legal one,
not a factual one.  Does section 924(c) apply to these facts?
Its language?  Its legislative history?  The decisional law
interpreting it?  On this issue, I write on nearly a clean slate.
There is virtually no precedent for applying this section to
facts like those present in the case at bar.

After reviewing the transcripts of the trial, and counsel's
submissions, I hereby **ORDER** that the defendants' motions for a
judgment of acquittal as to Count Three of the Indictment is
**GRANTED.**  Felton's motion for a judgment of acquittal on Count
Eleven of the Indictment is **DENIED.**

One further note:  The act of possessing the gun that is the
subject of these motions will not go unpunished.  The government
has convicted Felton for possessing the gun in question through
Count Four of the Indictment (felon in possession).  The
government will clearly argue during sentencing that I should
apply the sentencing enhancement for gun possession under
U.S.S.G. § 2D1(b)(1), arguably increasing the sentencing range
for the explosive device charge, but not triggering a consecutive
mandatory minimum term under § 924(c).  <u>See</u> <u>United States v.</u>
<u>Juan</u>, 59 F. Supp. 2d 210, 214-217 (D. Mass. 1999).

I.    **FACTUAL BACKGROUND**

    A.    **The Purchase of the Gun and Chase's Statements to James Niemczura**

In March 2001, while she was living in Indiana, Erica Chase obtained a gun, a 40 caliber Iberia semi-automatic pistol, from her employer, John Gaunder ("Gaunder"). Gaunder testified that Chase called him twice to arrange for the purchase of a gun and expressed an interest in purchasing a second gun. When he refused to sell her a second gun, she told him that if he later came across any other guns, she would be interested in buying them.

To James Niemczura ("Niemczura"), her friend, Chase reported that the gun was "for protection." Trial Transcript ("Tr.") 842. When asked what kind of protection she needed, Niemczura reported that Chase said, "from anyone trying to interfere with her plan." Tr. 847.

The government focuses on this statement as an important component of its claim that possession of the firearm was "in furtherance of" a conspiracy to make an explosive device. First, it should be noted that the statement -- characterizing her purpose in purchasing the gun -- is admissible only against Chase. Niemczura is not a co-conspirator.[5] See <u>United States v.</u>

---

[5] During Niemczura's testimony, I gave a limiting instruction to this effect. Felton's counsel did not object to the testimony on the grounds of <u>Bruton v. United States</u>, 391 U.S. 123 (1968).

Patterson, 644 F.2d 890 (1st Cir. 1981) (although a defendant's statement is admissible against defendant as a party admission under Fed. R. Evid. 801(d)(2)(a), it may be used against co-conspirator defendant only if found to be a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E)).

Second, there is some question as to what the plan was at the time Chase made the statement, and to what degree it was coincident with the conspiracy charge -- conspiracy to make and possess an unregistered destructive device.

**B.   What Was the Plan at the Time the Gun Was Purchased?**

That the plan concerned Felton and that it involved white supremacist and illegal activities seemed clear, based on all the evidence.

**1.   Chase's Characterization of the Plan to Niemczura (Admissible Only Against Chase)**

Chase had shared with Niemczura the fact that she had corresponded with Felton (although they had never met face to face) while Felton was in prison, that she and Felton were going to "go down in history," that Niemczura would read about the details of her plan in the papers, and that they would become "outlaws." Tr. 847-48. She also told him that they were going to burn off their fingerprints and assume the identities of missing children, that they were going to "go around and be

terrorists," but gave him no details of their plans in case he was ever questioned.[6]  Id.

### 2.  Correspondence Between Chase and Felton (Admissible Against Both)

The Felton-Chase correspondence suggests the same themes -- white supremacist activities, committing crimes (including bombings) -- but offers no concrete plans or mention of a gun.[7]

### 3.  Phone Calls Between Felton and Chase

The government introduced evidence of a substantial number of calls between Felton and Chase, coincident with Chase's purchase of the firearm.

Looking only at the evidence admissible against Chase, I conclude the following:  While Niemczura indicated that Chase did not talk specifically about violent acts or explosive devices,[8] and while the Felton-Chase correspondence also dealt in generalities, a fact-finder could conclude that Chase's reference

---

[6] Moreover, there was evidence that prior to meeting Felton, Chase had been a member of the World Church of the Creator, which the evidence suggested was an entity that espoused white supremacy and triggering a racial holy war.

[7] One letter from Felton to Chase does mention bombs in a more general way.  Felton described about how his head tattoos might limit his ability to commit crimes -- "Not to say there aren't vital actions that can be executed with whatever tattoos you like - there obviously are.  Car bombs, deployment of nerve agents, sniping, and many other things can be done without the need to 'blend in.'"

[8] When Niemczura was asked specifically about the details of the plan, he indicated that "all [he] knew about the plan" was that Chase was involved in counterfeiting and that he did not hear anything about violence in connection with the plan.  Tr. 877.  Niemczura also testified that Chase had taken money from him in order to buy a counterfeiting machine to finance her trip to Boston and "the plans that she had with Leo, after the trip to Boston."  Tr. 845.

to "plan" covered all of these activities -- violent and non-violent, some included within § 924(c), some not.  The question, as I describe below, is whether that conclusion fits the very specific language of §924(c) - "possession" of a firearm, "in furtherance of "a crime of violence."

### 4.   Felton's Purchases

During the same period, Felton was acquiring books describing how to assume a new identity as well as how to make explosives and silencers, and was writing to other co-conspirators concerning a plan for a "museum."  A co-conspirator, Michael Reid, wrote back to instruct him to "[p]lan well and be careful . . . . Many 'dry runs.'"[9]  A document given to visitors to the Holocaust Memorial in Washington, D.C. and a newspaper clipping regarding the Boston Holocaust memorial were found in the apartment shared by Chase and Felton.

### 5.   Inferences From the Timing of Chase's Gun Purchase

While Chase was still in Indiana, in February 2001, Felton was released from prison and moved to Ipswich with his wife, Lisa Meetre Felton ("Meetre").[10]  Many years earlier, in November 1996, Meetre had obtained a gun other than the firearm charged in connection with Count Three for Felton.  The jury found that this

---

[9] While there is no evidence that at the time Chase purchased the gun, that Felton's specific plans had been shared with her, she had surely joined the conspiracy as of that time.

[10] The two have since divorced, and Lisa Felton now goes by the name of Lisa Meetre.

gun had been brandished in a bank robbery committed by Thomas
Struss with Felton's aid, in February 2001.[11]  Struss testified
that Felton had enlisted him in the robbery in order to get money
for white supremacist activities.

By February 27, 2001, however, after the bank robbery and in
the middle of a carjacking, Struss was arrested with Meetre's
gun.  Around the end of March 2001, Felton indicated to Meetre
that he intended to obtain another gun from "a man named Brad."
Tr. 738-39.  Chase, who had been in touch with Felton regularly,
purchased her gun around the same time period, just prior to her
meeting him and moving in with him at the Salem Street apartment.

### 6.   Kathy McGaffigan's Conversations With Chase and Felton About the Gun

In April 2001, Chase came to Boston and met Felton for the
first time.  On April 9, 2001, Chase met Felton with her friend,
Kathy McGaffigan ("McGaffigan").  McGaffigan reported that Felton
spoke about building a bomb, and the crime of "shoot[ing]
niggers" in Chase's presence, but that she did not ever see him
or Chase carrying the gun.  However, Chase told McGaffigan that
she would keep the gun when she and Leo went out together because
Leo was not allowed to possess a weapon.[12]

---

[11] This is the subject of Counts Eleven and Twelve of the Indictment.

[12] Again, this statement is only admissible against Chase.  The
government has not suggested that McGaffigan was a co-conspirator at the time
of this conversation.

### 7.   <u>McGaffigan's Retrieval of the Gun and the</u> <u>Condition of the Felton-Chase Apartment</u>

After Chase's and Felton's arrest, Chase called McGaffigan and asked her to remove items from the 59 Salem Street apartment, including counterfeit money, white supremacist literature, a 50 pound bag of ammonium nitrate, and a gun.  The gun, which was loaded, was on the night stand in the bedroom, the same room as the bag of ammonium nitrate.  Chase and Felton lived in that apartment; their personal effects were within it.

## II.   <u>LEGAL ANALYSIS</u>

Felton and Chase claim that there is insufficient evidence to find them guilty of the crime of possession of a firearm in furtherance of the conspiracy to make and possess a destructive device.  In support of this claim, each defendant claims that the connection between the firearm and the underlying crime of violence is too tenuous to support a conviction.  In addition, Felton challenges the jury's conclusion that he possessed the firearm at all.

The central question, which is a difficult one, is what"possession" of a firearm "in furtherance of" a crime of violence means under Section 924(c).  Section 924(c) says in pertinent part:

> any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for

an enhanced punishment if committed by the use of a
deadly or dangerous weapon or device) for which the
person may be prosecuted in a court of the United
States, uses or carries a firearm, <u>or who, in
furtherance of any such crime, possesses a firearm,
shall</u>, in addition to the punishment provided for such
crime of violence or drug trafficking crime, [<u>be
sentenced to an additional term of years</u>].

18 U.S.C. § 924(c)(1)(A) (emphasis added).  In effect, § 924(c)
has two parts:  The prosecution must show beyond a reasonable
doubt (1) a nexus between the weapon and the defendant as
established by the defendant's actual or constructive possession
of the weapon, and (2) some "specific nexus" between the firearm
and the predicate offense.  <u>United States v. Mackey</u>, 265 F.3d
457, 462 (6th Cir. 2001).  <u>See also</u> <u>United States v. Timmons</u>, 283
F.3d 1246, 1253 (11th Cir. 2002).  Where the defendant brandishes
or actively carries the weapon, there is little problem with
either prong -- he plainly has dominion over the weapon and is
using it in the crime.  The problem here is that there was no
brandishing or active use.  The gun, everyone agrees, was only
"possessed."[13]

Moreover, the nexus between the firearm and the predicate
offense is complicated by the fact that the predicate offense is
a conspiracy charge, addressing conduct over a several month
period, even multiple goals.  Are the requirements of the section

---

[13] Felton has challenged the conclusion that he possessed the gun at
all.  However, given its physical location, his admissions, and inferences
from the timing of the gun's purchase, a fact-finder could conclude beyond a
reasonable doubt that he had constructive possession of the gun.

met if the gun "furthered" some overt act of the conspiracy, even if it was not the ultimate goal, or some other illegal act, like bank robbery, which is not charged in Count Three?

To the government, the issue is clear:  Felton needed a gun because he no longer had his ex-wife's gun.  Chase purchased a gun as part of the Chase-Felton "plan."  The plan included manufacturing bombs as well as other tasks such as counterfeiting and conceivably identity fraud.[14]  The gun was found in the same room as the explosive materials and counterfeit currency.  Thus, the gun was possessed in furtherance of that plan, which included the crime of violence charged here.

I think the issue is more complex:  The gun played no role in the conspiracy to manufacture a bomb.  The ammonium nitrate and the coffee maker (whose wiring was presumably used for a bomb) were purchased lawfully -- indeed, through Lisa Meetre's credit card.  The detonators, so called "bird bombs," were ordered by catalogue and sent to Lisa Meetre's home.

While the gun was clearly bought in knowing preparation for some illegal activities, as evidenced by Chase's reference to a plan and the timing of the purchase relative to Felton's comments to Meetre, the question is whether the statute requires a more direct connection -- that it was an integral part of the specific

---

[14] Felton's plans also included bank robbery and armed robbery (with Thomas Struss), but Chase was not indicted as a co-conspirator to these crimes.

illegal activity charged in Count Three, the conspiracy to make and possess an unregistered destructive device.[15]   The evidence raises a number of questions:   (1) What if the evidence suggests that the gun was related to crimes other than the substantive one charged?   Chase and Felton, for example, might have felt vulnerable to thieves stealing their counterfeit bills or the money Felton had obtained through the bank robbery with Struss. While counterfeiting is one of the overt acts of Count Three, the conspiracy to make and possess a destructive device, bank robbery is not.[16]   (2) What if the evidence is ambiguous concerning which crime the gun was facilitating, the overt act, or one not charged in Count Three?

To be sure, it does not take much to imagine how a gun might be generally connected to this crime, or any other crime -- if anyone resisted the placement of the bomb, to secure a getaway, etc. -- but that would be speculation.   Criminals purchase guns for such contingencies in every case.   If that is enough, any possession of a gun, by someone also committing a crime of violence or drug trafficking offense would be sufficient -- the "just in case" scenario.

---

[15] Count Three charges the defendants with possessing the firearm in furtherance of the specific crime of violence charged in Count One of the Indictment, namely conspiracy to make and possess an unregistered destructive device.   If the evidence showed that the gun was possessed to further a crime, it would not qualify for treatment under the statute.

[16] Paragraph 10(9) of the Indictment describes the overt act of Felton's sending counterfeit money to Chase in Indiana, "in part, to pay for her expenses to drive to Boston to join him."

What then did Congress mean when it included the language possession "in furtherance of" the crime of violence?

**A.   Historical Background of the Statute**

The original version of 18 U.S.C. § 924(c) was enacted as part of the Gun Control Act of 1968.  Pub.L. No. 90-615, 82 Stat. 1214 (codified as amended at 18 U.S.C. §§ 921-928 and scattered sections of 26 U.S.C.) (1988 & Supp. IV 1992).  Over the next several decades, the law was amended to impose ever more severe penalties when firearms were involved in the commission of a felony.[17]

In its first incarnation, the statute imposed a mandatory minimum sentence of between one and ten years upon an offender who "uses" or "carries a firearm unlawfully during the commission of any felony."[18]  In 1984, with the enactment of Comprehensive Crime Control Act of 1984 ("CCCA"),[19] Congress made several

---

[17] For a good overview of the historical changes to Section 924(c), see generally, Smith v. United States and the Modern Interpretation of 18 U.S.C. § 924(c): a Proposal to Amend the Federal Armed Offender Statute, 69 Notre Dame L. Rev. 815, 823-26 (1994).

[18] 18 U.S.C. § 924(c) (1982).  The statute provided in relevant part:

Whoever--
   (1) uses a firearm to commit a felony for which he may be prosecuted in a court of the United States or
   (2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States, shall in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years.

Id.

[19] Comprehensive Crime Control Act of 1984, Pub.L. No. 98-473, 98 Stat. 1837 (codified as amended in scattered sections of 18 U.S.C. and 28 U.S.C.).

significant changes to Section 924(c).  Unlike the original
version, the amended section did not contain a requirement that
the carrying of a firearm during a felony be "unlawful."  This
change was based on a determination by Congress "that persons who
are licensed to carry firearms and abuse that privilege by
committing a crime with the weapon . . . are as deserving of
punishment as a person whose possession of the gun [is
unlawful]."[20]

Nevertheless, Congress was concerned about the extension of
the statute to lawful possession.  The addition of the "in
relation to" language was intended to "preclude its application
in a situation where the gun's presence played no part in the
crime."[21]

_____

[20] Continuing Appropriations, 1985 -- Comprehensive Crime Control Act of
1984, S.REP. NO. 225, 98th Cong., 1st Sess. 314 n.10 (1983), reprinted in 1984
U.S.C.C.A.N. 3182, 3492 n.819.

[21] Id.  The footnote provides:

Evidence that the defendant had a gun in his pocket but did not
display it, or refer to it, could nevertheless support a
conviction for 'carrying' a firearm in relation to the crime if
from the circumstances or otherwise it could be found that the
defendant intended to use the gun if a contingency arose or to
make his escape . . . .  Moreover, the requirement that the
firearm's use or possession be 'in relation to' the crime would
preclude its application in a situation where its presence played
no part in the crime, such a gun carried in a pocket and never
displayed or referred to in the course of a pugilistic barroom
fight.

Id.

-14-

These concerns were exacerbated in 1986 when the statute was amended by the Firearms Owners' Protection Act,[22] to be applicable to drug offenses as well as crimes of violence.[23]   In effect, the initial versions of the statute were directed to gun violence as was commonly understood, to situations in which guns were brandished or carried.   When Congress extended the statute to cover drug offenses, as well as crimes of violence, it had to deal with special problems.   Unlike the crimes under the earlier version of the statute, drug transactions, at least on the surface, were apparently consensual, a willing buyer and a willing seller.   Violence was threatened, but not always overtly. So, courts struggled to stretch the "uses" and "carries" language to cover the presence of guns at the scene of a drug transaction.

I review this history -- even though it predates the version of the statute applicable here -- because it shows the kinds of situations with which Congress and the courts were concerned, situations very different from the case before me.

B.   **Case Law Until 1998**

The three most commonly espoused theories of "use" were as follows:   (1) The defendant "used" the firearm as an item of

---

[22] Pub.L. No. 99-308, § 104(a)(2)(A)-(E), 100 Stat. 449, 456 (1986).

[23] It was amended twice again, to increase Section 924(c)'s penalty provisions.   See Anti-Drug Abuse Act of 1988, Pub.L. No. 100-690, § 6460, 102 Stat. 4181, 4373-74; Crime Control Act of 1990, Pub.L. No. 101-647, § 1101, 104 Stat. 4789, 4829.

barter in a guns-for-drugs trade, see Smith v. United States, 508
U.S. 223, 240-41 (1993); (2) the fortress theory -- when firearms
and narcotics are found on the premises and the firearm is under
the control of the defendant, see, e.g., United States v.
Critton, 43 F.3d 1089, 1096-97 (6th Cir. 1995) (discussing the
fortress theory and holding that weapons are used or carried, for
§ 924(c) purposes, when it reasonably appears that weapons were
in the defendant's actual or constructive possession and were
used to protect drugs); United States v. McFadden, 13 F.3d 463,
465 (1st Cir. 1994) (finding that the presence of a firearm for
protection created a drug fortress); United States v. Wilson, 884
F.2d 174, 177 (5th Cir. 1989) (recognizing the fortress theory
where firearms were placed for ready use); United States v.
Matra, 841 F.2d 837, 843 (8th Cir. 1988) (finding that firearms
are used or carried "during and in relation to" the drug crime
when they are intended to protect drugs or otherwise facilitate
the crime); and (3) the emboldening theory -- where the defendant
"used" the firearm by deriving confidence (becoming "emboldened")
by its presence because it was hidden nearby and accessible.
See, e.g., United States v. Salazar, 66 F.3d 723, 728 (5th Cir.
1995) (finding that § 924(c)(1) is satisfied if a defendant used
or carried a firearm to embolden himself, to protect himself, or
to intimidate others); United States v. Stewart, 779 F.2d 538,
540 (9th Cir. 1985) (holding that there is a § 924(c)(1)

-16-

violation if the circumstances show that the firearm had a role

in the crime by emboldening the defendant).  Significantly, none

of these theories would have been sufficient to establish a §

924(c) offense in this case.

The Supreme Court's decision in Bailey v. United States, 516

U.S. 137 (1995), made some of these theories problematic under

the pre-1998 "uses" and "carries" language of the statute.  In

Bailey, the defendant's Section 924(c) conviction was based on a

loaded pistol that the police found inside a bag in his locked

car trunk, which they found pursuant to an arrest for possession

of cocaine found in the car's passenger compartment.  In the

related case, Robinson v. United States, the unloaded, holstered,

firearm that provided the basis for Robinson's Section 924(c)

conviction was found in a trunk in her bedroom closet after she

was arrested for a number of drug related offenses.  The D.C.

Circuit had held that one "used" a gun in violation of the

statute whenever one put the gun in a place from which one or

one's agent can gain access if necessary to facilitate a drug

crime.  Bailey, 516 U.S. at 141.

The Supreme Court reversed, holding that a defendant who

passively stores a firearm for later use cannot be considered

either "using" or "carrying" a firearm for § 924(c) purposes.

The lower court's "accessibility and proximity" test simply went

too far; "nearly every possession of a firearm by a person

-17-

engaged in drug trafficking would satisfy the standard," thereby
erasing the line that the statutes had tried to draw around
"uses" and "carries."   Id. at 144.   In Bailey, the Supreme Court
instead interpreted "use" to mean "active employment of the
firearm by the defendant."   Id. at 143 (emphasis in original).
The Court concluded, "Had Congress intended possession alone to
trigger liability under § 924(c)(1), it easily could have so
provided."   Id.

      **C.**   **1998 Amendment**

The most recent amendment to Section 924(c), passed in
November 1998, effectively took up the Court's challenge.
Congress added the language of "possesses a firearm" to the "uses
or carries" language.[24]   The debate surrounding that change
mirrored the earlier one, on the one hand, concerns about
extending the extraordinary penalties of the statute to those
whose possession of a firearm was essentially peripheral to the
crime of violence, and on the other the linkage of drugs and
guns, even when the gun was not brandished or actively used.

Congress effected a compromise.   It added "possesses" but
required that the possession be "in furtherance of" the crime.
Possession "in relation to" a crime of violence, the language
modifying "use or carries," was not enough.   Significantly, the
legislative history notes:   "The Committee believes that 'in

---

[24] See Act of Nov. 13, 1998, Pub. L. No. 105-386, 112 Stat. 3469.

furtherance of' is a "slightly higher standard, and encompasses the 'during and in relation to language.'"[25]  The legislative history further cited to the dictionary definition of the terms, defining "furtherance" as the "act of furthering, helping forward, promotion, advancement or progress."[26]  Taking a cue from conspiracy law, the Committee added:

> The government must clearly show that a firearm was possessed to advance or promote the commission of the underlying offense.  The mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing this particular mandatory sentence.  Rather, the government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the criminal activity.[27]

With the "in furtherance of" language, the Congress excluded from coverage not merely the ornamental gun -- the antique gun mounted on the wall -- but also guns that are accidentally present or even intentionally placed so long as they are not related to the crime at bar.

While the legislative history does not say so explicitly, two issues seem clear:  First, the decisionmaker should not merely assume, without more, that the gun was "in furtherance of"

---

[25] H.R.REP. NO. 105-344 (1997), 1997 WL 668339, at *11-12 (footnotes omitted).  See also United States v. Iiland, 254 F.3d 1264, 1274 (10th Cir.2001) (explaining that "in furtherance of" is a higher standard than "during and in relation to").

[26] H.R.REP. NO. 105-344 (1997), 1997 WL 668339, at *11-12 (footnotes omitted).

[27] Id.

the crime because it could be used for protection if the need arose. -- the generic "just in case" rationale.  As I have noted, guns are typically present for protection; illegal activities -- covert activities -- require more protection than lawful ones. If it is enough to <u>assume</u> that a gun was there to protect the illegal activities, then the "in furtherance of" language would be satisfied in each and every case.[28]  Second, Congress focused almost exclusively on the particular problem of drug cases -- the kinds of concerns that the pre-1998 case law had raised.

### D.   <u>Post-1998 Amendment Case Law</u>

The post-1998 case law is helpful but not dispositive. Again, all of the circuit court cases addressing the new "in furtherance of" language of Section 924(c) involve drug dealing, where guns arguably are possessed to make sure the drugs are secured, to make certain that no one will "rip off" the dealer, and to make certain that the purchaser pays.

---

[28] Significantly, the House section by section analysis of the changes in Section 924(c) suggests that the facts of <u>Bailey</u>  -- gun in the trunk of the car, drugs in the passenger compartment -- would not have met the possession "in furtherance of" standard.

The House report noted that the only testimony linking the gun to Bailey was an expert who noted that "drug dealers frequently carry a firearm to protect themselves, as well as their drugs and money," the generic argument described above. The report notes:

> Standing on its own, this evidence may be insufficient to meet the 'in furtherance of' test.  The government would have to show that the firearm located in the trunk of the car advanced or promoted Mr. Bailey's drug dealing activity.  The Committee believes that one way to clearly satisfy the 'in furtherance of' test would be additional witness testimony connecting Mr. Bailey more specifically with the firearm.

H.R.REP. NO. 105-344 (1997), 1997 WL 668339, at *12 (footnotes omitted).

In United States v. Mackey, 265 F.3d 457 (6th Cir. 2001),
for example, the police arranged for the purchase of crack
cocaine by a confidential informant in a particular house.  The
following day, the police executed a warrant for the search of
the house and found crack outside of the house and a loaded
shotgun in the living room near a scanner, electronic scales, and
razor blades.  The house did not function as a residence.  It was
plainly a place of business -- no kitchen implements, no food.
The Court found that the firearm qualified as possession "in
furtherance of" the drug activities because it was strategically
located so that it was quickly and easily available for use,
applying the factors originally articulated in United States v.
Ceballos-Torres, 218 F.3d 409, 414-415 (5th Cir. 2000).[29]

In Ceballos-Torres, the loaded gun was on top of the bed,
and the drugs were in the closet.  The court noted that mere
presence was not enough and that the evidence had to be more
specific to the particular defendant, showing that his or her
possession "actually furthered the drug trafficking offense."
Id. (Emphasis added).  As in Mackey, the trafficking was taking
place on that site.  The court found that a loaded handgun in

---

[29] The factors identified by the Ceballos-Torres court to determine
whether the possession of a firearm was in furtherance of a underlying drug
offense include: "the type of drug activity that is being conducted,
accessibility of the firearm, the type of the weapon, whether the weapon is
stolen, the status of the possession (legitimate or illegal), whether the gun
is loaded, proximity to drugs or drug profits, and the time and circumstances
under which the gun is found."  Ceballos-Torres, 218 F.3d at 414-415.

plain view on a bed furthered the enterprise.  See also United States v. Iiland, 254 F.3d 1264, 1273 (10th Cir. 2001) (requiring a "direct connection" between the firearm and the drug offense, that the gun possession "furthered, promoted or advanced [the] illegal drug activity"); United States v. Timmons, 283 F.3d 1246, 1253 (11th Cir. 2001) (finding that loaded firearms in close proximity to crack cocaine in apartment were sufficient to support a conviction under Section 924(c)); United States v. Wahl, 290 F.3d 370, 376-377 (D.C. Cir. 2002) (holding that gun recovered near cocaine and cash in apartment led to reasonable inference that gun provided defense in furtherance of drug trafficking).

Do I take the Mackey, Ceballos-Torres line of cases to mean that proximity and accessibility to the implements of the crime -- any crime -- is enough for a Section 924(c) violation?  Do I simply substitute ammonium nitrate and wiring for drugs, and note that the gun was in close proximity -- the court says "strategically located", Mackey, 265 F.3d at 461 -- to these implements?  Is the physical location coupled with inferences from the other evidence sufficient to meet § 924(c)'s standards?  Or do I distinguish between the kinds of factors that make possession relevant in a drug case from the kinds of factors present here?

One key distinction between the case at bar and cases involving drug trafficking is that here there was no reason to believe that Felton or Chase would have any contact with strangers in their apartment, where the gun was found.  In contrast, in drug trafficking cases, the defendants regularly brought customers into the site where the gun or guns were found in order to deal drugs.  The presence of a gun could "provide[] protection in case a drug deal in the apartment turns sour" or act as a deterrent to anyone thinking about stealing the drugs or proceeds during a transaction.  Ceballos-Torres, 218 F.3d at 412. There is no indication that the gun played any such role in the Felton-Chase apartment.

Moreover, unlike the drug trafficking cases, the items that the gun was supposedly meant to protect here were both relatively worthless and lawful to obtain.  A disassembled coffee maker has little value and is unlikely to be a target for theft.  And although an assembled destructive device is illegal to possess, possession of the unassembled components is not, in itself, a crime.  As a result, a conclusion that Felton or Chase possessed the gun in order protect against someone stealing or interfering with these valueless and lawfully obtained items becomes even more tenuous.

If the offense were the substantive charge, the manufacture of the destructive device itself, the inquiry would be somewhat

easier.  What facts tie the gun to the defendant's specific

substantive activities in manufacturing a bomb?  In what specific

ways did it advance that activity?  The mere presence of the gun

in the apartment where the bomb was assembled would not

necessarily be enough.

While the conspiracy charge broadens the crime to dates,

times and acts far beyond the actual manufacture of the

destructive device, there are limits.  Merely possessing a

firearm during the course of the conspiracy is not enough to

support criminal liability. See United States v. Lampley, 127

F.3d 1231, 1241 (10th Cir. 1997) (holding that under the "carry"

prong of Section 924(c), "mere carrying of the gun temporally to

the conspiracy is not sufficient to meet the 'during and in

relation to' element [of Section 924(c)] . . . . Some further

nexus must be shown, such as an overt act of planning for,

preparation for, or agreement to the conspiracy.") The government

must demonstrate a specific nexus between the defendants'

possession of the firearm and the goal of the conspiracy, or at

least an overt act.

To be sure, the government's case involves more than simply

the proximity of the gun to the unassembled bomb components, but

not close enough. Chase's reference to a "plan," coming months

before she arrived in Boston and met Felton face to face, when

"plans" of all kinds were imagined in their correspondence, was

ambiguous. Likewise were Felton's references to the activities in which he intended to engage.  There were multiple plans -- some charged in Count Three, some not, some including Chase, some not, some qualifying as a crime of violence, some not, and some listed as an overt act in the conspiracy (like counterfeiting), some not. No witness testified that he or she saw either defendant carrying this gun, with the sole exception of the individual from whom Chase initially obtained it. Neither defendant was armed when he or she was arrested. While the Chase-Felton correspondence, and Felton's correspondence with other coconspirators was voluminous, this gun was nowhere mentioned.

As I noted earlier, one can surely speculate how the gun might be used to facilitate the bomb making conspiracy, how it might be used to effect a getaway, to prevent someone from interfering with the bomb's placement. But section 924(c) requires a more specific inquiry.  One can speculate in a similar fashion in connection with virtually any crime. If this is sufficient, we will have moved a considerable distance from the brandishing and carrying cases, and even from the extension of those cases to possession in furtherance of drug transactions.

Under the circumstances, I am obliged to conclude that Count Three must be dismissed with respect to both defendants.

III. <u>**COUNT ELEVEN -- CONSPIRACY TO COMMIT ROBBERY OF AN ARMORED CAR**</u>

In Count Eleven of the Indictment, Felton is charged with conspiracy to commit bank robbery and to interfere with commerce by robbery.  Felton argues that this charge must be dismissed because no evidence supports it except for the alleged statement of Struss, Felton's co-conspirator.  He cites <u>United States v. Sepulveda</u>, 15 F.3d 1161, 1181-2 (1st Cir. 1993) for the proposition that some extrinsic evidence must exist, aside from the proffered statement of a co-defendant, in order to support a conspiracy conviction.

However, <u>Sepulveda</u> held only that under Fed. R. Evid. 801(d)(2)(E), a co-conspirator's <u>hearsay</u> statement may not be admitted unless some extrinsic proof of the defendant's involvement in the conspiracy exists.  <u>Id.</u>  Here, Struss, Felton's co-conspirator, testified in person at trial, and therefore, there was no hearsay issue.  In addition, there was, in fact, extrinsic evidence apart from Struss' statements that supports Felton's involvement in the conspiracy to rob the armored car.  Struss was arrested in New Jersey with the gun bought by Lisa Meetre.  A reasonable inference from Struss' possession of this gun is that Felton gave it to him in order to commit the robbery.  This corroborates Struss' testimony that he and Felton conspired to commit an armored car robbery in New Jersey.

-26-

As a result, Felton's motion for a judgment of acquittal on Count Eleven of the Indictment is **DENIED**.


IV.   <u>CONCLUSION</u>

For the reasons stated above, my previous order denying (at that time) Chase's motion for judgment of acquittal on Count Three is hereby **VACATED**.   After reconsideration, Chase's motion for judgment of acquittal on Count Three [docket entry # 166] is now **GRANTED**.   Felton's renewed motion for acquittal [docket entry # 190] is **GRANTED** in part and **DENIED** in part.   The motion is **GRANTED** with respect to Count Three of the Indictment and **DENIED** with respect to Count Eleven of the Indictment.

**SO ORDERED.**

Dated: September 13, 2002

NANCY GERTNER, U.S.D.J.