IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED IN CLERKS OFFICE
2002 DEC -9 P 2:46
U.S. DISTRICT COURT DISTRICT OF MASS.

UNITED STATES OF AMERICA ) CRIMINAL NO. 01-10198-NG
)
v. )
)
LEO FELTON )

**UNITED STATES' SENTENCING MEMORANDUM**

The United States submits the following memorandum which both responds to the points raised in the defendant's sentencing memorandum and articulates the government's sentencing recommendation.

It is anticipated that the final pre-sentence report ("PSR") will reflect that the sentencing guideline range for Leo Felton is 262-327 months. Based on that range, the government recommends that the Court sentence the defendant to 327 months for the following primary reasons, as set forth below in more detail:

1. By operation of the Armed Career Criminal guideline, §4B1.4, the sentencing range, in essence, does not adequately reflect all the other criminal conduct for which Felton was convicted. Thus, a sentence at the high end of the range is necessary to better capture and punish the full scope of his criminal activities.

2. Felton's ultimate goal to target persons and property for death and destruction based on his racial and ethnic antipathies is deserving of additional societal and judicial



228

condemnation and is constitutionally permissible. *See e.g.*, Barclay v. Florida, 463 U.S. 939 (1983).

3. As shown by the defendant's past violent criminal history, his own avowed plans of using violent means to achieve his revolutionary goals, and by the immediacy with which he began to plan and carry out robberies and bombings after his release from prison, Leo Felton is, and will continue to be, a dangerous threat to the safety of the community at large.

**A. The Defendant Possessed Separate Firearms In Connection with The Conspiracy to Make A Destructive Device and the Conspiracy and Commission of a Bank Robbery and Thus an Offense Level of 34 is Warranted for Both Groups**

Under the Armed Career Criminal guideline, §4B1.4(b)(3), subsection (A) calls for an offense level of 34 if the defendant possessed a firearm in connection with a crime of violence. The PSR has applied this guideline to the defendant's possession of the .38 revolver in connection with bank robbery committed by him and Thomas Struss but did not apply the subsection to the defendant's possession of the Iberia pistol stored in his apartment and removed by Kathy McGaffigan. The government submits that the PSR is incorrect in its latter determination.

In order to apply U.S.S.G. § 4B1.4(b)(3)(A), the court must conduct a two-part inquiry, first deciding whether the predicate offense is a violent felony, and then considering whether the defendant used or possessed a firearm in connection with the violent predicate offense. United States v. Gary, 74 F. 3d 304

(1st Cir. 1996). Here, there is no question -- and the court has already found in this case -- that Count One, the conspiracy to make and possess a destructive device, is a crime of violence. The same holds true for the bank robbery charged in Counts Eleven and Twelve.

As for the second inquiry, the court is to consider the facts to determine whether there is a sufficient nexus between possession of the firearm and commission of the underlying offense. Gary, at 316-17, citing United States v. Samuels, 970 F. 2d 1312, 1316 (4th Cir. 1992). In so doing, the First Circuit has instructed that the phrase "in connection with" should be interpreted broadly, and that where a defendant's possession of a firearm has the "potential to aid or facilitate the commission of another offense," the requisite link is present. United States v. Peterson, 233 F.3d 101, 111 (1st Cir. 2000), citing United States v. Thompson, 32 F. 3d 1, 7 (1st Cir. 1994) (interpreting similar statutory language in U.S.S.G. § 2K2.1(b)(5). The First Circuit has made clear that the nexus between the possession of the firearm and the crime of violence need not be very strong. As the Court stated:

> [T]here must be some reasoned link between a defendant's possession of the firearm and the commission or attempted commission of another offense. While it is difficult to sketch the outer boundaries of this link, there is no question that where a defendant's possession of a firearm somehow aids or facilitates, or has the potential to aid or facilitate, the commission of another offense, the defendant's possession of the firearm is causally and logically related to the other offense. *A defendant's possession of a firearm cannot therefore simply be*

*coincidental.*

Thompson, 32 F.3d at 5-6 (emphasis added).

Using this broad interpretation, previous decisions have found the requisite link where "the weapon provides an added sense of security, and has a substantial potential for use in the course of the particular crime in question." United States v. Sturtevant, 62 F. 3d 33 (1st Cir. 1995).[1] Thus, the "firearm need not be actually used by the defendant himself, or in any particular way." Thompson, 32 F.3d at 7.[2]

Turning first to the bank robbery, the evidence from Thomas Struss established that Felton brought the gun along to Boston in connection with their plan to do a robbery that day. At trial, Struss testified:

> [H]e said we we're going to bring the gun, and for me to get ready, just in case we find any easy target, being that the city was a little ways away. [Tr. 382]

Later, Struss testified that after they looked around at various

---

[1]For example, in Gary, the court correctly found that the possession of guns by two burglars who armed themselves when they decided to commit the breaking and entering crimes facilitated the commission of those crimes. 74 F.3d at 316.

[2]Of course, in Paragraph 32, the PSR only refers to "use" of the firearm and not "possession." It is assumed that this was not intentional. See Gary, 74 F.3d at 317. n.11, citing Bailey v. United States, 116 S.Ct. 501, 508-09 (1995)(recognizing that §4B1.4(b)(3)(A) reaches offenses for which the defendant either used or possessed a firearm).

banks, Felton went into a few to case it out. [Tr. 383].[3] He then found the one they would rob. They located a spot in an alley a block and half up where they would later meet after the robbery and Struss would get rid of the clothes. Contrary to Felton's distortion of the record in his sentencing memorandum as to where Struss testified Felton was located with the gun, it was not in this alley a block and half away. Rather, Struss testified as follows:

> Q: And how was the bank robbery to be affected (sic)?
> A: I would go into the bank with a note. He would be on the corner, hidden, across the street with a gun.

[Tr. 384].

Under these facts, the PSR was correct in applying the "in connection with" language to Felton's possession of this gun during the robbery. Felton's possession of the gun was neither coincidental nor unrelated; it provided security and potentially aided the commission of the robbery. After all, why else risk carrying a gun as a convicted felon?

Given this broad framework within which to apply §4B1.4(b)(3)(A), there is also ample evidence to establish that Felton's joint possession of the Iberia pistol was also not merely

---

[3]In his sentencing memorandum Felton mischaracterizes the testimony in an effort to argue that he would not have gone into a bank with a gun because they discussed metal detectors. However, Struss's testimony was that they discussed that such kinds of security doors exist, not that he went into banks that had such devices. [Tr. 383].

coincidental but "in connection with" the plan to construct and possess a destructive device. The following evidence supports this finding:

- Chase lived for several months in Indiana without owning or possessing a gun, but she suddenly became interested in purchasing firearms a few weeks before she moved to Boston to join Felton's "cell";

- when Chase purchased the weapon from John Gaunder, she asked him if she could buy a second gun, and when Gaunder refused, she told him she would be interested in buying any other guns he came across;

- Chase acquired the gun only weeks after Felton lost access to Lisa Meetre's .38 revolver as a result of Thomas Struss's arrest in New Jersey, and Chase and Felton spoke on the telephone repeatedly during this interval;

- Chase told James Niemczura that she bought the semiautomatic pistol for "protection" from "anyone trying to interfere with her plan" with Leo Felton;

- Chase told Niemczura that they would become "terrorists" and "outlaws" in connection with the same "plan," and that he would read about her activities with Felton in the newspapers and that they "would go down in history;"

- the loaded pistol was kept in the same apartment where Felton and Chase were constructing their bomb;

- all of this activity took place during the charged period of the conspiracy to build and possess a destructive device, of which both defendants were convicted;

- Chase later asked McGaffigan to confirm to Felton that the gun and the bomb-making materials had been removed from the Salem St. apartment as instructed.

In sum, the direct evidence from Chase that the intended purpose of the gun was to protect the plan from any interference (which evidence can and should be attributed to Felton), and the

circumstances of its acquisition, coupled with its loaded condition and location in the apartment in the same room as the bomb-making materials, is more than sufficient evidence to prove that Felton possessed the gun "in connection with" the charged crime of violence. Felton and Chase's possession of the gun was neither coincidental nor unrelated to their plan to build and possess a bomb. Indeed, acquiring and keeping it to protect this plan from interference is precisely the kind of possession that "has the potential to aid and facilitate" the commission of another offense and is thus "in connection with" that offense as contemplated by the guidelines.[4] See e.g., Thompson, 32 F.3d at 8(having the firearm available to protect drug supply is "in connection with"); United States v. McFadden, 13 F.3d 463-465 (1st Cir. 1994)(presence of a readily available weapon in a location containing drugs is enough to meet the "in connection standard").

Thus, §4B1.4(b)(3)(A) should apply to the Iberia firearm removed from the apartment as well.

**B. The Defendant Is Not Entitled to an Acceptance of Responsibility Reduction**

To be awarded the two-level reduction under U.S.S.G. § 3E1.1, a defendant has the burden of "clearly demonstrating acceptance of

---

[4]It is also worth noting, as the district court did in its Memorandum and Order granting a judgment of acquittal on the § 924(c) count, that the requisite nexus between the possession of the firearm "in furtherance of" the underlying crime for statutory liability under §924(c) is different from the application of the "in connection with" language of the guidelines.

responsibility for his offense." United States v. Lombard, 72 F.3d 170, 187 (1st Cir. 1995). Felton has utterly failed to meet that burden in this case, as shown by his behavior before and after the trial, and there is nothing in the record to support the application of that adjustment.

In the first instance, at no time before his conviction had the defendant demonstrated any admission of or responsibility for his criminal conduct. Rather, Felton has only expressed this purported sentiment in a post-conviction letter to this Court. Furthermore, as much as this letter purports to accept responsibility for his criminal actions, it also includes a laundry list of excuses that attempt to minimize, explain away, or outright deny his criminal conduct, especially some of the criminal conduct at the core of his convictions. For example, though he states that he "thought about" constructing an explosive device, he maintains that he had no intention of using it against a physical target or person. Yet, in so stating, Felton is contesting the jury's verdict of guilty in Count Two, which required, as one of its elements, that he attempted to receive explosives with the intent to kill or injure persons or to destroy property. Indeed, his attempts to minimize and discount his conduct and intent are directly contradicted not only by the evidence at trial, but by his own recent statements in a magazine article:

> I'll tell you point blank. I was going to kill and die for it. That's a no-brainer. . . . I thought I was going

to be dead within a year.

Moreover, he continues in his letter to challenge the crucial testimony against him, calling Struss's testimony lies, as well as McGaffigan's testimony about the conversations about a bomb as false. He even contests statements made by Erica Chase to federal authorities about the her knowledge of the planned construction of a bomb.

The First Circuit has stated that "[t]he reduction for acceptance of responsibility serves two distinct purposes: to recognize a defendant's sincere remorse and to reward a defendant for saving the government from the trouble and expense of going to trial." United States v. De Leon Ruiz, 47 F.3d 452, 455 (1st Cir. 1995). Though it is even difficult to construe Felton's post-conviction letter as remorseful for his actions, Felton's failure to plead to these charges and save the public the expense of trial is a point beyond contention. Application Note 2 of § 3E1.1 specifically states that this adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."

Felton suggests that even though he in fact did got to trial and was convicted, he should be granted the departure. According to the guideline commentary, the reduction is ordinarily not available to a defendant who has put the government to its proof.

De Leon Ruiz, 47 F. 3d at 455. And as the First Circuit has noted, it is "a rare case in which a defendant can go to trial and still receive a reduction [under § 3E1.1]." Id. The defendant asserts that it would be appropriate to characterize his case as the "rare situation" noted in Application Note 2 where "a defendant clearly demonstrates his acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." The application note suggests, "[t]his may occur...where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt."[5] Felton contends that his is the "rare" case that deserves the post-conviction reduction because he says he went to trial not to contend each of the charges for which he was convicted, but to defend himself against the 924(c) charge - a charge for which he was acquitted after verdict by this Court - as well as to defend a perceived persecution for his beliefs in violation of the First Amendment.[6] The First Circuit rejected

---

[5]One example of such a situation is a defendant raising a constitutional challenge to a statute or challenging the applicability of a statute to his conduct. Additionally, certain defenses which admit the actions taken but contest a defendant's culpability have not necessarily precluded the acceptance of responsibility deduction. See United States v. Johnson, 956 F. 2d 894, 903-05 (9th Cir. 1992) (raising defense of duress); United States v. Barris, 46 F. 3d 33, 35 (8th Cir. 1995) (assertion of insanity defense not an automatic bar to reduction for acceptance of responsibility); United States v. Fleener, 990 F. 2d 914, 918 (6th Cir. 1990) (raising defense of entrapment).

[6]The assertion in his sentencing memorandum that he offered to plead to all but the 924(c) charge is erroneous, and even

similar arguments in De Leon Ruiz. In that case, the defendant was initially charged with various drug violations as well as a firearms violation. Id. at 452. At trial, the jury convicted him on the drug transaction charges, but acquitted him on the firearms offense. The defendant argued that he should be eligible for acceptance of responsibility due to the fact that prior to trial he was willing to plead guilty to the drug charges -- the only charges he was convicted of. Id. at 455. The First Circuit opined that De Leon could have pled to the drug charges and contested the gun charge, instead "he chose to roll the dice in the hope that he would be acquitted on all counts." Id., see also e.g., United States v. Peery, 977 F.2d 1230, 1234 (8th Cir. 1992)(where defense challenged statute but also argued he possessed good faith belief to spend money the way he did, exception not applicable); United States v. De Leon-Rodriguez, 70 F.3d 764, 767 (3d Cir. 1995)(where defendant challenged selected legal issues but also sought to challenge the government's evidence, including the credibility of witnesses, exception not applicable); United States v. Osmani, 20 F.3d 266, 269 (7th Cir. 1994).

Even if the Court credits Felton's assertion that he merely went to trial to defend himself on the firearms charges, or to

---

inconsistent with his letter which states that if he knew the 924(c) count would have been eventually dismissed, "I probably would've copped out, had I been able to, on most of the indictment."

defend his constitutionally protected ideas, his pre-trial conduct makes the § 3E1.1 adjustment unavailable.[7] When a defendant goes to trial to assert and preserve issues that do not relate to factual guilt, "a determination that [the] defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." Barris, 47 F.3d at 35, citing Application Note 2. After Felton was arrested he did not take any action to admit guilt, assist the government in obtaining evidence or any other activities which would be consistent with an attitude of responsibility or remorse. Rather, he took actions to ensure that the hard drive from his computer was destroyed and evidence removed from the apartment on Salem Street so as to obstruct the investigation of his crimes. These actions are inconsistent with actions of remorse and should be dispositive in a decision to deny the reduction under 3E1.1. See Isabel v. United States, 980 F. 2d 60, 65 (1st Cir. 1992) (a defendant convicted of obstruction of justice is highly unlikely to be granted a reduction for acceptance of responsibility); United States v. Aymelek, 926 F. 2d 64, 69 (1st

---

[7]The primary case on which he relies, United States v. Ellis, 168 F.3d 558 (1st Cir. 1999), does not support the application of acceptance in this case. In Ellis, at trial defense counsel admitted guilt on a drug charge in his opening statement, as did the defendant in his testimony, and only sought to challenge the firearms-related charge. Although the First Circuit remanded to the district court for further findings, it noted that Application Note 2 requires a focus on *pre-trial* statements and conduct and that the defendant had an "uphill battle." Id. at 564(emphasis in original).

Cir. 1991) (the defendant who obstructs justice "will thereby forfeit a credit for acceptance of responsibility" under the guidelines).

The First Circuit's opinion in United States v. Bennett, 37 F.3d 687 (1st Cir. 1994) is instructive on the operation of this adjustment. The Bennett court reversed the sentencing court's awarding of an acceptance of responsibility adjustment where the defendant had gone to trial in a bank fraud case. The defendant had paid back certain monies in a civil settlement before the criminal trial and later challenged the applicability of 18 U.S.C. § 1344 to his conduct at trial. Despite going to trial and being convicted, the defendant was successful in being awarded a two-level reduction for acceptance of responsibility. However, on appeal, the Court found the district court's awarding of acceptance of responsibility to be clearly erroneous. Id. at 697. Even assuming that the defendant had expressed remorse, the First Circuit held that the record did not support a finding that the defendant had gone to trial merely to preserve issues that did not relate to factual guilt. Id. Indeed, the court noted that the defendant's denial of any intent to defraud, as expressed through his counsel's argument, constituted a denial of factual guilt. Id. As such, the criteria for the "rare" exception was not met.

Lastly, the Court in Bennett provided some guidance applicable to the question before this court:

> Having stressed that post-trial acceptance of responsibility is the exception and must normally be borne out by pre-trial actions, we nevertheless do not intend to establish any blanket rule; the guideline's own application note leaves open the possibility of exceptions. **But we do think that unless some obvious basis is apparent from the record, it may be difficult to uphold a reduction in cases where the defendant went to trial, asserted his or her innocence, and has nothing substantial in the way of pre-trial conduct to show earlier acceptance of responsibility** -- unless the district court is able to point to some persuasive reason for this determination.

Id. at 698, n.16 (emphasis added).

Here, Felton's defense at trial challenged almost every bit of proof offered by the government -- from the fact that he purchased a bag of fertilizer and it was removed from the apartment and left on the curb with the trash to the fact that he robbed a bank and planned an armored car robbery with Struss. Nor has he shown how his decision to go through a criminal trial preserved his rights to free speech. The record here provides absolutely no basis to support a finding that this defendant is entitled to a two-level reduction for acceptance of responsibility.

**C. A Downward Departure is Not Warranted Because Defendant's Criminal History is Not Significantly Over-Represented**

Under the PSR, Felton's sentencing range is based first on a Offense Level of 34, statutorily predicated on his four previous convictions for violent felonies and his possession of a gun in connection with the bank robbery. His criminal history is Category

VI, based on alternatively: (1) his 18 points of criminal history, which is five more than the minimum; (2) the fact that he qualifies as a Career Offender under §4B1.1; and (3) the fact that he possessed the firearm in connection with a crime of violence. *See* §§4B1.4(c)(1) and (2).

Felton seeks a downward departure on his assertion that Category VI over-represents his criminal history and he is not likely to recidivate. In making these unfounded claims, he mischaracterizes and minimizes his past violent criminal conduct.

§4A1.3 authorizes a departure "where the court concludes that a defendant's criminal history significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." This applies to sentencing under the Career Offender provision, *see* United States v. Lindia, 82 F. 3d 1154 (1st Cir. 1996), and may well apply to the Armed Career Criminal provision, although the First Circuit has not decided this issue. While the First Circuit has held that youth and proximity of crimes are not a sound basis for a court to disregard the ACC statutory enhancement, United States v. Riddle, 47 F.3d 460,462 (1st Cir. 1995), in a Career Offender drug case the full Court split evenly in deciding whether a court could ever look at the facts of the previous convictions to determine if the minor nature, or "smallness" of the case, could warrant a departure. United States v. Perez, 160 F.3d 87 (1st Cir. 1998) (en banc).

Felton's case for a downward departure on these grounds is woefully inadequate. First, he qualifies for Category VI treatment all three ways possible: as a Career Offender with two prior crimes of violence; as possessing a gun in connection with a crimes of violence; and independently in scoring an excessive number of criminal history points.

Second, his past crimes are extremely violent in nature and occurred over a number of years. In October, 1989, Felton was charged with attempted murder and assault with intent to cause serious injury related to his confrontation with an Hispanic taxi driver in New York City. Felton's version of the offense, rejected by the jury as shown in his letter, was that he never touched the tire iron used to beat the driver. As shown in the PSR, the victim suffered a fractured jaw and skull. Moreover, contrary to Felton's assertions that he harbored no racial animosities prior to going to prison, the PSR cites reports that indicate that he bragged to others that he had beaten a Pakistani.

While on release from this charge, in November, 1989, Felton and a friend burglarized a fraternity house at Rutgers and ended up beating a member who chased them. While it is unclear who inflicted the injuries, the victim received 15 stitches in the side of the head. Notably, the records reflect that racial slurs were made during that assault, and the victim harbored a paranoia later about "skinheads." Thus, contrary to Felton's claims, the prison

climate he entered neither triggered his violence nor his racial hostilities.

In prison, however, he only sharpened both proclivities. In February, 1993, in a New York prison Felton assaulted an Hispanic inmate with a razor, causing a 12" laceration on the side of his face and others on his arms and hands. In a New Jersey institution in July, 1993, Felton attacked a black inmate with a razor because he felt the inmate had reached over his plate at dinner. Contrary to Felton's claim "that I felt threatened so I assaulted him with a razor," the assault took place by ambush some two hours later while the inmate was watching television. After slicing the inmate in the neck with razor, Felton screamed, laughed and yelled "that he wanted blood and that he felt good."

Felton's attempt to explain away his sustained history of violent conduct by reference to the prison context is not only belied by the facts of his pre-prison conduct, but notably, by the crimes he committed and planned to commit upon his release. His plans to use explosives to bring death and damage to the community were not situational nor reactive. They represented a calculated and deliberate course of violent action to bring about his misguided goals of racial separation. His likelihood of recidivism is starkly demonstrated by the fact that it took him all of three months to commit a string of crimes after serving 10 years in prison.

Moreover, his attempt to use his family background (and troubled youth that allegedly stems from it) to minimize the seriousness of prior crimes is contradicted by the guidelines that hold that such factors are prohibited grounds for departure. §5H1.12. In other words, the fact that these factors may have contributed to Felton's commission of prior serious crimes does not make them any less serious for purposes of §4A1.3.

In short, there is nothing about Felton's criminal record that shows that it significantly over-represents its seriousness or the danger to the community that exists when Felton is not behind bars.

**D. Felton Should be Sentenced to 327 Months in Prison**

The government submits that a sentence at the highest end of the range is well-justified both for the scope and nature of the defendant's criminal conduct and for the protection of society. In the first instance, it is particularly reasonable for the Court to impose a sentence at the high end because the operation of the Armed Career Criminal guideline alone results in a range of 262-327 months. Sentencing at the high end would then better take into consideration the destructive device, explosives, bank and armored car robbery, counterfeiting and obstruction offenses for which the defendant was also convicted.

Second, it is not only constitutionally permissible but relevant for the Court to take into account Felton's motive in committing the crimes he did. It is one thing to construct a

destructive device, which is illegal in and of itself. It is even more serious and deserving of additional punishment to be building such a device for the avowed purpose of killing persons and destroying their property or memorials or museums because of their perceived ethnicity and race. *See* Barclay v. Florida, 463 U.S. 939 (1983)(a sentencing judge properly may take into account the defendant's racial animus towards his murder victim where that animus is relevant to several statutory aggravating factors); U.S.S.G. §3A1.1 (sentence enhancement for selecting victim or victim's property based on perceived race, religion, ethnicity, gender, sexual orientation, etc.). Thus, in determining where in the sentencing range to impose an appropriate sentence, this Court should factor in the racial and ethnic hatred that motivated Felton's criminal conduct.

Lastly, Leo Felton needs to be isolated from society for its general protection. It should not be forgotten that Felton began planning "to write his name on the tablets of history" months before his release from prison. By his own admission, he expected to be dead within a year. Fortunately, his plans to take a multitude of innocent people with him were interrupted by his arrest.

The Court should impose a sentence at the top of the guideline range that is commensurate with the grave consequences Felton sought to bring about and the future danger he presents.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: [signature]
S. THEODORE MERRITT
EMILY R. SCHULMAN
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon counsel Lenore Glaser, Esq. 25 Kingston Street, 6th Floor, Boston, MA 02111 and Timothy Watkins, Esq., Federal Defender, 400 Atlantic Avenue, Boston, MA 02210 by hand delivery a copy of the foregoing document.

This 9th day of December, 2002.

[signature]
S. THEODORE MERRITT
ASSISTANT UNITED STATES ATTORNEY